**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **BOWHEAD INFORMATION TECHNOLOGY SERVICES, LLC.,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CATAPULT TECHNOLOGY, LTD.,**<br><br>**Defendant.** | **Civil Action No. 04-1668 (JDB)** |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Bowhead Information Technology Services, LLC ("Bowhead") is a government contractor that provides information technology ("IT") services to the Department of Transportation ("DOT").  Bowhead brings this action against defendant Catapult Technology, LTD ("Catapult"), a government contractor that formerly provided IT services to the DOT, alleging that Catapult's unwillingness to release its employees from the non-compete provision in its employment agreements violates the "Continuity of Service" provision in its contract with the DOT.  Bowhead alleges that this provision requires Catapult to exercise its best efforts to facilitate an orderly transition of a government contract to a successor company -- in this case, Bowhead.

Bowhead's complaint seeks a declaratory judgment enforcing the "Continuity of Service" provision and voiding the non-compete provisions in Catapult's employment agreements.  The complaint also seeks damages from Catapult, on the theory that Catapult's threats of civil litigation against its employees and Bowhead amount to tortious interference with Bowhead's

prospective business relationships with those employees and its existing business relationship with the DOT.  Catapult has now filed a motion to dismiss the complaint in its entirety.  For the reasons explained below, the Court grants the motion to dismiss those claims in the complaint that requested a declaratory judgment.  But because the allegations in the complaint can conceivably be read to encompass a tortious interference claim, the Court denies the motion to dismiss the damages claim in the complaint at this time.

## BACKGROUND

The factual background set out below is drawn from the allegations in plaintiff's complaint.  Bowhead and Catapult are competitors in the field of computer and information technology.  Am. Compl. ¶ 9.  For a number of years, Bowhead and Catapult employees worked together in the same offices at DOT headquarters in Washington, D.C., providing information technology, telecommunications, networking and technical support services to the DOT.  Id. Throughout this period, Bowhead and Catapult remained under separate government contracts with the DOT.  Id. ¶ 10.

Consistent with Federal Acquisition Regulation ("FAR") § 52.237-3, the contract between Catapult and the DOT contained a "Continuity of Services" provision.  That provision reads, in relevant part:

a.    The Contractor recognizes that *the services under this contract are vital to the Government and must be continued without interruption* and that, upon contract expiration, a successor, either the Government or another contractor, may continue them. The Contractor agrees to-

1. Furnish phase-in training; and

2. *Exercise its best efforts and cooperation to effect an orderly and efficient transition to a successor. . . .*

2

c.      . . . *The Contractor shall allow as many personnel as practicable to remain on the job to help the successor maintain the continuity and consistency of the services required by this contract.* The Contractor also shall disclose necessary personnel records and allow the successor to conduct on-site interviews with these employees. *If selected employees are agreeable to the change, the Contractor shall release them at a mutually agreeable date and negotiate transfer of their earned fringe benefits to the successor.*

Id. ¶ 13.  Bowhead alleges that, notwithstanding this language, Catapult requires its employees to sign contracts that prohibit the employees from working for Catapult's competitors or customers for a period of one year from the date that they end their employment with Catapult.  Id. ¶ 14.

On August 24, 2004, the DOT notified Catapult that it did not intend to renew its contract with the company, and that it would instead consolidate its IT support services into a sole source contract with Bowhead to commence on October 1, 2004.  Id. ¶¶ 15, 16.  Bowhead claims that Catapult then embarked on a campaign to prevent the DOT from cancelling its contract and consolidating the services thereunder with Bowhead.  Id. ¶ 18.  As one example of Catapult's conduct during this period, Bowhead alleges that Catapult solicited the support of the Small Business Administration, the Disabled Veterans' Association, executives of DOT, and members of Congress, in an attempt to dissuade the DOT from contracting exclusively with Bowhead.  Id.

Bowhead also maintains that Catapult took improper steps to prevent Bowhead from hiring Catapult's employees to perform work under the new consolidated contract.  After the DOT's August 24, 2004 notification, a number of Catapult employees approached Bowhead to inquire about possible employment opportunities with the company.  Id. ¶ 17.  On September 16, 2004, Catapult wrote a letter to Bowhead accusing the company of "aggressively soliciting for hire" Catapult's employees, and threatening to file suit against the company if it were to hire any

of the employees from Catapult.  Id. ¶ 22.  Bowhead responded with a letter dated September 17,

2004, requesting that Catapult release certain identified employees from their employment

contracts so that Bowhead could assemble the team necessary to provide continuous and

uninterrupted services to the DOT.  Id. ¶ 23.  Bowhead alleges that it did not recruit employees

from the general population because only those individuals currently employed by Catapult under

its DOT contract possessed the institutional knowledge and mission-critical information

necessary to maintain continuity and consistency of service.  Id. ¶ 30.

On September 21, 2004, the DOT issued a Task Order confirming that Bowhead would

be required to staff and operate the consolidated IT services by October 1, 2004.  Id. ¶ 24.  That

day, Catapult wrote a letter to Bowhead denying that Catapult was obliged to release its

employees from their contracts, and again threatening to sue Bowhead if it attempted to hire any

Catapult employees.  Id. ¶ 25.  Bowhead alleges that it made numerous attempts during this

period to meet with Catapult to discuss a mutually agreeable date for the release of employees to

work for Bowhead, but Catapult refused to do so in a deliberate effort to delay or sabotage

Bowhead's performance under the new contract.  Id. ¶ 27.

Bowhead alleges that on or about the afternoon of September 30, 2004, Catapult

instructed its employees not to entertain any employment offers from Bowhead.  Id. ¶ 29.

Catapult told the employees that it would be filing suit against Bowhead, and would also seek to

enforce the non-compete provisions of the employment agreement against any person who went

to work for Bowhead.  Id.  On the evening of September 30, 2004, Bowhead made offers of

employment to fourteen Catapult employees.  Id. ¶ 30.  The following day, officials from

Bowhead and Catapult met to discuss the dispute, and Bowhead again requested that Catapult

4

release the fourteen individuals from the non-compete provisions of the Catapult employment

contract.  Id. ¶ 32.  Once again, Catapult refused Bowhead's request, and informed Bowhead that

it would sue.  Id.  On the afternoon of October 1, 2004, Bowhead officially hired twelve of the

fourteen Catapult employees to whom it had extended offers.  Id. ¶ 33.[1]

To the Court's knowledge, Catapult never filed suit against Bowhead.  Bowhead, on the

other hand, commenced this action against Catapult on September 28, 2004.  Bowhead's

complaint[2] contains three counts.  In Count One, Bowhead seeks a declaratory judgment that the

"Continuity of Service" provision in the contract between the DOT and Catapult requires

Catapult to release those of its former employees who were hired by Bowhead from the non-

compete provisions of their employment agreements with Catapult.  Id. ¶ 39.  In Count Two,

Bowhead seeks a declaratory judgment that the non-compete restrictions in Catapult's

employment contracts are unenforceable as a matter of law and public policy.  Id. ¶ 51.  Finally,

in Count Three, Bowhead asserts a claim of damages for tortious interference with prospective or

existing contractual relations.  Bowhead premises this claim on the theory that Catapult's

repeated threats of litigation represent an improper interference with Bowhead's current business

relationship with the DOT and Bowhead's prospective contractual relationship with former

Catapult employees.  Pl. Opp. at 7.

On October 25, 2004, Catapult filed a motion to dismiss each of the counts of the

complaint.  Catapult moves to dismiss Counts One and Two on the ground that Bowhead lacks

---

[1]  Bowhead alleges that all of these individuals had already become former Catapult
employees in light of the expiration of the Catapult contract.  Id. ¶ 33.

[2]  Bowhead filed an amended complaint on October 4, 2004.  All cites and references to a
complaint throughout this opinion are to the amended complaint.

standing to sue on a contract to which it is neither a party nor an intended third-party beneficiary.

Catapult argues that Count Three should be dismissed on the ground that its various efforts to

preserve its contractual relations with the DOT cannot support a tortious interference claim, and

in particular that its threats of litigation constituted a lawful effort to enforce a valid, legally

binding non-compete provision.

## STANDARD OF REVIEW

A motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) will not be granted unless "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also Haynesworth

v. Miller, 820 F.2d 1245, 1254 (D.C. Cir. 1987).  All that the Federal Rules of Civil Procedure

require of a complaint is that it contain "'a short and plain statement of the claim' that will give

the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

Dura Pharmaceuticals, Inc. v. Broudo, 125 S. Ct. 1627, 1634 (2005) (quoting Conley, 355 U.S. at

47).  "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a

complaint only if it is clear that no relief could be granted under any set of facts that could be

proved consistent with the allegations.'"  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514

(2002) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)).

Under Rule 12(b)(6), the plaintiff's factual allegations must be presumed true and should

be liberally construed in his or her favor.  Leatherman v. Tarrant County Narcotics &

Coordination Unit, 507 U.S. 163, 164 (1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 968

(D.C. Cir. 1979).  The plaintiff must be given every favorable inference that may be drawn from

the allegations of fact.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Sparrow v. United Air

Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Conclusory legal and factual allegations,

however, need not be considered by the court.  Domen v. Nat'l Rehabilitation Hosp., 925 F.

Supp. 830, 837 (D.D.C. 1996) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

## ANALYSIS

In Counts One and Two, Bowhead seeks a declaratory judgment that the "Continuity of

Services" provision in the Catapult DOT contract is applicable to the facts and circumstances of

this case, and a declaratory judgment that the non-compete provisions in the Catapult

employment contracts are null and void.  In Count Three, Bowhead seeks damages for tortious

interference based on Catapult's efforts to prevent the DOT from entering a sole source contract

for IT services with Bowhead.  Catapult has filed a motion to dismiss the first two counts of the

complaint for lack of standing, and the final count for failure to state a claim.

The Court addresses each of the counts in turn.

## I.      Count One:  Declaratory Judgment Claim Relating to "Continuity of Services" Provision in Catapult DOT Contract

In the first count of its complaint, Bowhead wishes to enforce the terms of a government

contract between the DOT and Catapult.  Although Bowhead is not a party to that contract, and

the DOT itself has not taken any steps to enforce the "Continuity of Services" clause in the

contract, Bowhead seeks a declaratory judgment that Catapult has in fact violated this clause.

Bowhead asserts that it has standing to enforce that clause because it is an intended third-party

beneficiary to the contract.  Catapult moves to dismiss the claim for lack of standing.

To sue under a contract to which it is not a party, a plaintiff "must demonstrate that he is

an intended third-party beneficiary, as evidenced by the intent or words of the . . . contract."

Sallee v. United States, 41 Fed. Cl. 509, 514 (1998).  A plaintiff need not be named in a contract to be a third-party beneficiary.  Nortel Networks, Inc. v. Gold & Appel Transfer, S.A., 98 F. Supp. 2d 81, 90 (D.D.C. 2004) (citing R.A. Weaver and Assoc. v. Haas and Haynie Corp., 663 F.2d 168, 175 (D.C. Cir. 1980)).  However, the parties to a contract must "directly and unequivocally intend to benefit a third-party in order for that third-party to be considered an intended beneficiary."  Barnstead Broadcasting Corp. v. Offshore, 886 F. Supp. 874, 879 (D.D.C. 1995).  The parties' mere knowledge or awareness that a contract may benefit a third-party is insufficient, without more, to demonstrate an intent to confer a benefit on the third-party.  Id. at 880.

Here, the contract between Catapult and the DOT does not expressly name any third-party as a beneficiary.  Moreover, Bowhead does not allege that the "Continuity of Services" provision was intended to directly and unequivocally benefit Bowhead as the succeeding government contractor.  The most that Bowhead alleges about the contract is that it contains the standard "Continuity of Services" language required by the FAR.  Am. Compl. ¶ 13.  The Court can hardly infer from this fact alone that the parties intended to treat Bowhead as a third-party beneficiary.  Indeed, if anything, the language of the "Continuity of Services" clause demonstrates an intent exclusively  to benefit the DOT.  See id. ("[t]he services under this contract are vital *to the Government* and must be continued without interruption" (emphasis added)); id. (explaining that Catapult must "[p]rovide experienced personnel during the phase-in, phase-out period to ensure that the *services called for by this contract* are maintained at the required level of proficiency"

(emphasis added)).[3]

To be sure, Catapult and the DOT may have understood in entering into their contract that the "Continuity of Services" clause would incidentally benefit a successor contractor such as Bowhead by making it easier for the contractor to provide services to the government during a period of transition.  However, mere *incidental* beneficiaries do not have standing to enforce the terms of a contract.  To bring suit on a contract, a third-party to a contract must be an *intended* beneficiary of the contract.  Sallee, 41 Fed. Cl. at 515 ("Plaintiff is not an express or implied third-party beneficiary, but merely an incidental beneficiary to the . . . contract.  Accordingly, plaintiff fails to establish a relationship that would cure his lack of privity with the Government.").  "Third-party beneficiaries of a Government contract are generally assumed to be merely incidental beneficiaries," and as indicated, there is nothing in the particulars of this case to suggest a contrary result here.  Beckett v. Air Line Pilots Ass'n., 995 F.2d 280, 288 (D.C. Cir. 1993).  Bowhead has therefore failed to allege the facts necessary to establish standing to sue, and Count One of the complaint fails as a matter of law.

## II.    Count Two:  Declaratory Judgment Claim Relating to Non-Compete Provisions in Catapult Employment Contracts

In Count Two, Bowhead requests a declaratory judgment that the non-compete provision in the employment contract between Catapult and its employees is void because it is inconsistent with Catapult's obligations under its contract with the DOT.  Once again, none of Catapult's

---

[3]  The regulations provide that a contracting officer "may" insert the Continuity of Services clause into a government contract when "services under the contract are considered vital to the Government and must be continued without interruption" and when the "Government anticipates difficulties during the transition from one contractor to another."  FAR § 37.110.  Neither of these preconditions suggest an intent to confer a benefit on the successor contractor.

current or former employees has sought to challenge these provisions in their contracts.
Bowhead nonetheless asks that this Court declare these provisions unlawful, and asserts that it
has standing to seek this relief based on Catapult's threats to bring suit against its employees and
Bowhead "to enforce the non-compete provisions in the employment contracts."  Pl. Opp. at 4.

Courts routinely hold that a plaintiff that has hired (or wishes to hire) the employees of a
competitor does not have standing to sue that company to seek nullification of a non-compete
agreement between the competitor and its employees.  See, e.g., Premiere Pyrotechnics, Inc. v.
Zambelli Fireworks Manuf., No. 05-3112, 2005 WL 1307682, at *2 (W.D. Mo. May 31, 2005)
(plaintiff company lacks standing to seek declaratory judgment regarding the enforceability of
competitor's non-compete agreement with individual who terminated employment with
competitor to work for plaintiff); Defiance Hosp., Inc. v. Fauster-Cannon, Inc., 344 F. Supp. 2d
1097, 1118 (N.D. Ohio 2004) (hospital and medical services provider lack standing to challenge
non-compete agreements between a competing medical clinic and its nurse anesthetists).
Plaintiff has not cited a single case to the contrary.  The Court sees no reason to depart from this
rule here.

The fact that Catapult has threatened to sue Bowhead and its employees does not change
this result.  Plaintiff is correct that a threat of litigation can give rise to standing to seek a
declaratory judgment to resolve an "actual controversy" between "interested" parties.  28 U.S.C.
§ 2201(a).  However, there must be "a substantial controversy, between parties having adverse
legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory
judgment."  United Christian Scientists v. Christian Science Bd. of Directors, First Church of
Christ, Scientist, 829 F.2d 1152, 1159 n.25 (D.C. Cir. 1987) (quoting Maryland Cas. Co. v.

10

Pacific Coal & Oil Co., 312 U.S. 270, 273 (1941)).  The threat of litigation made by Catapult against its employees does not provide Bowhead with an "adverse legal interest" to Catapult such that Bowhead could bring a declaratory judgment action against Catapult.  And Catapult could no more bring suit against Bowhead for violating the employment contract between Catapult and its employees than Bowhead could bring suit against Catapult to enforce that contract.

A tort claim by Catapult against Bowhead would perhaps present a greater likelihood of success.  However, there is no allegation in the complaint that the threat of such a suit was ever "immedia[te] and real[]."  United Christian Scientists, 829 F.2d at 1159.[4]  And even if the threat of such a suit was "immediate and real" at the outset of this case, it is no longer.  An "actual controversy must be extant at all stages of review, not merely at the time the complaint is filed."  Preiser v. Newkirk, 422 U.S. 395, 401 (1975); see Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1058-59 (Fed. Cir. 1995) (dismissing declaratory judgment action where there was no longer "a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit"); Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1154 (3d Cir. 1995) ("[R]ipeness requires that the threat of future harm must remain 'real and immediate' throughout the course of the litigation.").

More than nine months have now passed since the date that Bowhead hired twelve Catapult employees.  Catapult has not carried out its earlier threat to bring a lawsuit against Bowhead.  Bowhead does not claim in its pleadings or other papers that Catapult has repeated its threats or taken some other action to suggest that it will commence litigation against Bowhead in

---

[4]  It is unclear that Bowhead claims that Catapult was contemplating a tort action at all (Bowhead talks only of Catapult's threats of a suit "to enforce the non-compete provisions in the employment contracts").

the foreseeable future.  In fact, the non-compete provisions in the Catapult employment contracts
-- which run for a year from the date the employee leaves the employ of Catapult -- have almost
expired as to the employees in this case.  At this point, it cannot credibly be said that the threat of
litigation is still "immediate and real" or an "active controversy" such that a declaratory judgment
is an appropriate form of relief.

In a nearly identical case decided earlier this year, a judge of the Western District of
Missouri considered a complaint seeking a declaratory judgment that a competitor's non-compete
provision in its employment contract was unenforceable.  The plaintiff alleged that he had
"received letters from defendants' counsel threatening legal action if plaintiff tortiously interfered
with defendant's employment contract" by hiring one of its employees.  Premier Pyrotechnics,
2005 WL 1307682, at *1.  The plaintiff then hired the employee, and the defendant did not file
suit in the four months between the hiring and the court's opinion.  The Court granted the
defendant's motion to dismiss for lack of standing, noting that plaintiff's speculative "fear that
defendant may, at some time in the future, file a lawsuit against plaintiff for employing [the
defendant's employee] and/or soliciting defendant's customers and employees, is not indicative of
immediate danger" of a lawsuit.  Id. at *2.  The reasoning of that case applies with equal force
here.  The unfulfilled and unrepeated threats of litigation nine months ago cannot serve as the
basis for declaratory relief.  Count Two of the Complaint is no longer justiciable, and therefore
must be dismissed as a matter of law.

III.    **Count Three:  Tortious Interference with Business/Contractual Relations**

In Count Three, Bowhead alleges that Catapult intentionally interfered with Bowhead's

prospective business and contractual relations.[5]  Am. Compl. ¶ 52.  To survive a motion to

dismiss on a claim of intentional interference with a business relationship, Bowhead must plead

(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship

or expectancy on the part of the interferer, (3) intentional interference inducing or causing a

breach or termination of the relationship or expectancy, and (4) resultant damage.  See Browning

v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002) (quoting Bennett Enters. v. Domino's Pizza, Inc.,

45 F.3d 493, 499 (D.C. Cir. 1995)).  Moreover, the defendant's interference must be improper.

Furash & Co. v. McClave, 130 F. Supp. 2d 48, 56 (D.D.C. 2001).  "Competitive activity by itself

will not be deemed tortious interference with business relations unless accomplished by wrongful

or improper means, such as fraud, violence, or civil suits."  Id. (quoting Mercer Mgmt.

Consulting v. Wilde, 920 F. Supp. 219, 239 (D.D.C. 1996)) (additional internal citations

omitted).

      Here, Bowhead alleges that Catapult "has engaged and continues to engage in intentional

and willful acts calculated to cause damage to Bowhead's lawful business with the DOT."  Am.

Compl. ¶ 53.  The specific acts that Bowhead cites as improper or wrongful are Catapult's

solicitation of support from the Small Business Administration, the Disabled Veterans'

Association,  DOT executives and members of Congress in an effort to dissuade the DOT from

---

     [5]  Bowhead stated its claim as "tortious interference with prospective contractual relations/business relationships."  Am. Compl. at 12.  For purposes of this motion, the Court has interpreted that claim to mean that Catapult allegedly interfered with both a current business relationship between the DOT and Bowhead as well as a prospective contractual relationship with former Catapult employees.  There is no difference between the two torts other than the particular relationship allegedly being interrupted.  The Court therefore treats the allegation of tortious interference with prospective contractual relations/business relationships as a single claim which happens to pertain to two different business relationships.

contracting with Bowhead, and Catapult's repeated threats of litigation against its employees and

Bowhead regarding the non-compete provisions in its employment agreements.  Pl. Opp. at 7.

Catapult's mere efforts to dissuade the DOT from consolidating its IT support services

into a sole source contract cannot provide the basis for a claim of tortious interference with

business relationships.  See, e.g., Scutti Enterprises, LLC. v. Park Place Entertainment Corp., 322

F.3d 211, 216 (2d Cir. 2003) (wrongful means for purposes of a tortious interference claim

"do not . . . include persuasion alone although it is knowingly directed at interference with the

prospective contract" (quotation and alterations omitted)).  "A competitor's conduct must be

more egregious, for example, it must involve libel, slander, physical coercion, fraud,

misrepresentation, or disparagement."  Genetic Sys. Corp. v. Abbott Labs., 691 F. Supp. 407, 423

(D.D.C. 1998) (quotation omitted).  Bowhead does not claim that Catapult's solicitation of the

DOT involved coercion or the use of false information, or indeed that it involved anything other

than a general intent to interfere with a plaintiff's business dealings, which is insufficient to

impose liability.  See id.[6]

The allegations that Catapult made improper threats of litigation against Bowhead and

Catapult's employees present a closer question.  The District of Columbia follows the

Restatement with respect to tortious interference claims.  See Canady v. Providence Hosp., 942

F. Supp. 11, 17-18 (D.D.C. 1996); Casco Marina Devel., L.L.C. v. District of Columbia, 834

A.2d 77, 84 (D.C. 2003).  The Second Restatement of Torts recognizes that litigation or threats

of litigation are among the improper means that can give rise to a claim for tortious interference

---

[6]  Moreover, although a plaintiff must show causation and damages to state an interference claim, there is no suggestion here by Bowhead that it has suffered any harm as a result of Catapult's efforts in this regard.

with prospective contractual relations:

> Litigation and threat of litigation are powerful weapons.  When wrongfully
> instituted, litigation entails harmful consequences to the public interest in judicial
> administration as well as to the actor's adversaries.  The use of these weapons of
> inducement is ordinarily wrong if the actor has no belief in the merit of the
> litigation or if, though having some belief in its merit, he nevertheless institutes or
> threatens to institute the litigation in bad faith, intending only to harass the third
> parties and not to bring his claim to definitive adjudication.

Restatement (Second) of Torts § 767 cmt. c (1979).

Bowhead alleges that Catapult's threats to sue for interfering with its relationship with its

employees are frivolous and therefore improper.  However, Catapult is asserting rights under a

valid non-compete provision in its employment contract.  Although Bowhead would like the

Court to declare these provisions null and void, the Court has held that Bowhead lacks standing

to seek this relief.  And at least as Bowhead describes them in its complaint, the non-compete

provisions would appear on their face to bar the employees in this case from leaving Catapult

and working for Bowhead during the first year of the transition to a consolidated sole-source IT

contract for the DOT.  The question this case presents, therefore, is whether the threat to bring a

*colorable* cause of action against a competitor or employee can be improper conduct for purposes

of a tortious interference claim.

The Restatement indicates that the answer is yes.  The text of comment c to § 767 states

that a lawsuit or threat of lawsuit is wrongful not only "if the actor has no belief in the merit of

the litigation," but also if the actor, having some belief in the merit of the suit, "nevertheless

institutes or threatens to institute the litigation in bad faith, intending only to harass the third

parties and not to bring his claim to definitive adjudication."  Id.  The weight of the case law also

seems to support a rule that a tortious interference claim can be premised on even a colorable

claim that is brought exclusively in bad faith.  See, e.g., Nat'l Ass'n of Prof'l Baseball Leagues v. Very Minor Leagues, Inc., 223 F.3d 1143, 1150 (10th Cir. 2000) (granting summary judgment on tortious interference claim because "Very Minor Leagues has not demonstrated that Professional Baseball Leagues could not have had a belief in the merit of the litigation" and "Very Minor Leagues has not presented evidence that Professional Baseball Leagues' act of bringing suit was *intended only to harass Very Minor Leagues*") (emphasis added); Jane Lyons Advertising, Inc. v. Cook, No. 97-01069, 1998 WL 164775, at *7 (D.D.C. Mar. 31, 1998) (denying motion to dismiss tortious interference claim where plaintiff alleged, among other things, that defendant "sent a letter threatening legal action" and "defendant's conduct was designed to interfere with the contract between plaintiff and Augustine and/or Stafford"); In re Insley, No. 98-5062, 1999 WL 33457181, at *17 (Bankr. D. Md. Sept. 30, 1999) (holding that it "would be a perverse result" were an individual permitted "to file a lawsuit in bad faith with the intent to cause damage to another if the individual can, after the fact, cobble together a legal theory which could support his or her claim").  Although this is not the uniform approach of the courts,[7] this Court believes that District of Columbia courts would follow the Restatement and the cases cited above and hold that colorable suits may give rise to a tortious interference claim in the *limited circumstance* where the defendant brought or threatened to bring suit with the sole intention to harass.

Bowhead alleges in its complaint that "the Catapult DOT contract has expired[, and] thus[] enforcement of the non-compete provision provides no economic benefit to Catapult," and

_____

[7]  See, e.g., Roeder v. Rogers, 206 F. Supp. 406, 412 (W.D.N.Y. 2002) ("It is only when civil suits or other proceedings are 'frivolous' that there might be a viable claim for tortious interference."); Gresh v. Potter McCune Co., 344 A.2d 540, 541-43 (Pa. Super. 1975) (limiting inquiry into whether defendant's institution of litigation against plaintiff was wrongful to the issue of whether the defendant was bringing a colorable claim).

that "under the circumstances of this case, enforcement of the Catapult non-compete provisions is not necessary for the protection of Catapult's business or its good will." Am. Compl. ¶¶ 45, 46.  Although not phrased in terms of "motivation" or "harassment," and lacking the detail that one might hope, these allegations nonetheless can plausibly be read to state a claim that Catapult's sole motivation in threatening a civil suit was to harass Bowhead.  At this stage of the proceedings, and in light of the liberal notice pleading standard, these allegations survive -- although just barely -- Catapult's motion to dismiss.

Nonetheless, proving such a claim will not be an easy task.  Only in the most exceptional of circumstances -- where the defendant's sole motivation in threatening to bring a colorable suit was to harass, and the defendant had no interest in bringing his claim to a definitive adjudication -- does the law suggest that a plaintiff can base a tortious interference claim on such a threatened suit.  See Restatement (Second) of Torts § 767 cmt. c (1979).  Plaintiff will also be obliged to prove the remaining elements of a tortious interference claim, and the allegations with regard to some of these elements are thin as well.[8]  Finally, the conflict in this case is now nine months

---

[8]  For instance, as to causation and damages, the complaint alleges only the jurisdictional prerequisite that Bowhead has suffered actual damage and loss resulting from Catapult's interference with Bowhead's efforts to secure the DOT contract in an amount in excess of $75,000.  Am. Compl. ¶ 55.  Bowhead provides more detail in its opposition, citing damages that flow from "efforts to dissuade the DOT from doing business with Bowhead, inability to hire certain critical employees, and the ongoing threat of frivolous litigation by Catapult."  Pl. Opp. at 7.  It is not entirely clear how *Catapult*'s "efforts to dissuade the DOT" led to damage to *Bowhead*, particularly since -- notwithstanding Catapult's efforts -- Bowhead received the contract from the DOT.  The reference to damages in the form of an "ongoing threat of frivolous litigation" is just as puzzling:  the threat of litigation by Catapult is what Bowhead elsewhere in the complaint alleges is the *improper interference* supporting a claim of tortious interference claim, not the *damages* resulting from that claim.  That leaves Bowhead's inability to hire certain critical employees.  Here, the complaint alleges that Bowhead was able to hire twelve of the fourteen former Catapult employees it claims it needed in order to provide continuous IT services to the DOT.  Am. Compl. ¶ 33.  It is questionable whether the failure to acquire the other two

old.  Plaintiff would do well to consider, in light of the governing law, whether it is prepared to

undertake the expense and effort necessary to establish a tortious interference claim in this case.

## **CONCLUSION**

For the foregoing reasons, defendant's motion to dismiss for failure to state a claim is

granted as to Count One and Count Two, but is denied as to Count Three.  The Court will hold a

status conference on August 18, 2005, at 9:00 a.m., to discuss the proceedings in this case

moving forward.  A separate order will be issued.


_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge


Dated:    __July 18, 2005__

---

employees suffices as resultant damages on a tortious interference claim.

Copies to:

Andrew Michael Friedman
Michael D. White
Patton Boggs, LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-5267
Fax: (202) 457-6315
Email: afriedman@pattonboggs.com
       *Counsel for plaintiff*

George Alexander Lehner
U.S. Department of State
2430 E Street, NW
Washington, DC 20037
(202) 776-8321
Fax: 202-776-8388
Email: lehnerg@pepperlaw.com
       *Counsel for defendant*